Argued and submitted February 23, judgment vacated and remanded with instructions on appeal; affirmed on cross-appeal November 14, 2001

Millicent NAITO,
an individual and personal representative of
the Estate of William S. Naito;
W. Robert Naito,
an individual;
Terri W. Naito,
an individual;
Steven L. Naito,
an individual;
Lisa H. Naito,
an individual,
*Respondents - Cross-Appellants,*

*v.*

Samuel T. NAITO,
an individual;
H. Naito Corporation,
an Oregon corporation;
Samuel T. Naito; Verne R. Naito;
James H. Meyer and David Kobos,
Directors of H. Naito Corporation,
*Appellants - Cross-Respondents.*

Anne NAITO-CAMPBELL
and Douglas Campbell,
individuals,
*Respondents - Cross-Appellants,*

*and*

Kenneth C. NAITO,
an individual,
*Intervention Plaintiff,*

*v.*

H. NAITO CORPORATION,
an Oregon corporation,
and Samuel T. Naito,
an individual,
*Appellants - Cross-Respondents.*

9805-03781; A107052

35 P3d 1068

Barnes H. Ellis argued the cause for appellant - cross-respondent Samuel Naito. Christopher H. Kent argued the cause for appellants - cross respondents H. Naito Corporation, Verne R. Naito, James H. Meyer, and David Kobos. With them on the briefs were James N. Westwood, Scott E. Crawford, Stoel Rives LLP, and Kent Conley & Rundle.

Jeffrey Bennett and Steven L. Naito argued the cause for respondents - cross-appellants. With them on the briefs was Tarlow, Jordan & Schrader.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

EDMONDS, P. J.

## EDMONDS, P. J.

Plaintiffs[1] are four shareholders of H. Naito Corporation (the corporation) and the spouses of three of them.[2] In this action, they assert a number of claims against the corporation and four of its directors, who include the controlling shareholder. Defendants appeal a judgment that was based on the trial court's finding that the corporation and the controlling shareholder had acted oppressively toward plaintiffs and that the controlling shareholder had violated a stock buy-sell agreement. As a remedy, the court ordered defendants to elect one of the plaintiffs to the corporation's board, required the corporation to pay dividends of $710,000 for every year that its net income is at least $1.3 million, and imposed various requirements concerning its future corporate structure. The court rejected plaintiffs' other claims. Plaintiffs cross-appeal in several respects. On the appeal, we vacate the judgment and remand for modification. We affirm on the cross-appeal.

■     Because the claims in this case are equitable, we state the facts as we find them on *de novo* review, giving appropriate weight to the trial court's credibility findings. ORS 19.415(3).[3] The case involves a family business that has played a prominent role in Portland for many years. All of the current shareholders are members of the family. Hide Naito (Hide),[4] the founder, was a Japanese immigrant who came to this country in the early part of the twentieth century. In 1921, he started H. Naito Gifts, a small shop in downtown Portland that sold merchandise imported from Japan. Hide gradually expanded the business to additional locations and

---

[1] Unless the context requires otherwise, all references to plaintiffs include the intervention plaintiffs.

[2] Each nonshareholder spouse owns some shares jointly with the shareholder spouse for the benefit of their children.

[3] Plaintiffs argue that their claim for breach of the buy-sell agreement is legal in nature. The nature of a claim depends primarily on the nature of the relief sought and received, not on the issues raised or decided. *See McIntyre v. Photinos*, 175 Or App 478, 481-83, 28 P3d 1259 (2001). Because plaintiffs sought and received solely equitable relief in their breach of contract claim, it is subject to *de novo* review.

[4] We will refer to all members of the Naito family by their first names, both for convenience and because doing so is consistent with the family's internal usage.

began selling at wholesale as well as retail. In 1938, he opened his own warehouse in what is now known as the Old Town area of Portland. During World War II, Hide and his family moved to Salt Lake City, thus avoiding internment, but the business essentially collapsed. Hide and his son Samuel Naito (Sam) reestablished the business in the years following the war. His younger son, William Naito (Bill), later joined them in the business.[5] The wholesale business sold Asian giftware to thousands of gift shops and larger retailers around the country; at some point, the wholesale part of the business came to dominate the enterprise. The business was incorporated in 1958 as the Norcrest China Company.[6] Hide continued working in it until a few years before his death in 1989, although Bill and Sam owned the controlling stock by 1980. Bill was the president when he died in May 1996. Sam is currently the president and chief executive officer.

The corporation has its offices in the Old Town area of Portland, which contains many late nineteenth and early twentieth century buildings that had declined in condition and value over the years. Beginning in the 1950s, the corporation acquired a number of those buildings and became a significant Old Town landlord, playing a leading role in the revitalization of the area. In addition to its Old Town investments, the corporation has taken on several major real estate projects, most of which involve buildings of historical significance. The first of those projects was the purchase in 1975 of the former Olds & King department store building in downtown Portland; the corporation converted it into the Galleria, Portland's first downtown retail mall. Other major projects include the construction in 1982 of McCormick Pier, an apartment complex along the Willamette River across what was then Front Street[7] from Old Town, and the conversion in

---

[5] Hide's third son, Albert Naito, was once involved in the business but left well before the events at issue in this case.

[6] In 1992 Norcrest changed its name to H. Naito Corporation as part of a corporate reorganization. Since then the corporation's wholly owned subsidiaries have included a newly incorporated Norcrest China Company, which operates the retail business, and H. Naito Properties, which conducts the real estate business.

[7] After Bill's death, the City of Portland changed the name of Front Street to Naito Parkway in honor of Bill's and the Naito family's contributions to the city.

the mid-1980s of a former Montgomery Ward catalog warehouse in northwest Portland into Montgomery Park, a large office and meeting complex. Finally, in partnership with other entities, the corporation redeveloped the former Albers flour mill north of McCormick Pier into an office building.

During those same years, the corporation also expanded its retail business beyond the giftware business. The corporation created two new chains of stores, "Import Plaza," which sold a variety of imported goods, and "Made in Oregon," which, as the name implies, sells only items that were "made, caught, or grown" in Oregon. The corporation was also involved for a period in a partnership that distributed "Dr. Martens" shoes.

Over the years, Sam and Bill held various titles in the corporation, but in practice they owned the only voting stock and ran the business together after Hide's role declined.[8] Sam focused his efforts on the retail side of the business, while Bill managed and developed the real estate interests and dealt with the corporation's various lenders. Their relationship was both close and contentious; they frequently argued with each other, but they also relied on each other and made all significant decisions jointly. Bill was the driving force behind the riskier decisions. Some members of Sam's family and, to some extent, Sam himself, resented what they saw as Bill's attempts to dominate Sam, to denigrate his ability, and to push him into ventures that he might have preferred to avoid.

Sam and Bill had significantly different approaches to corporate decisions. Although each tended to ruminate about issues, and neither made up his mind quickly, Bill tended to take risks while Sam was more cautious. The Galleria, McCormick Pier, and Montgomery Park projects were primarily Bill's ideas, and each was a risky venture that involved a new direction for the corporation. Although each project proved to be successful, many members of the Naito family, including some of Bill's and Sam's children, were not comfortable with what they referred to as Bill's "empire

---

[8] For a period of time, all of the shareholders were also directors. However, by the time of Bill's death, the board consisted of only Sam and Bill.

building." Bill also played a more prominent role in Portland civic life and received more publicity than did Sam; some in the family thought that Bill wanted to give the impression that he was bright and creative while Sam simply plodded along. Over the years, these and other issues led to resentments between Bill and his family and Sam and his family, resentments that affected the parties after Bill died.

Sam's and Bill's goals for the corporation emphasized the growth of its overall value rather than immediate returns; they also tried to avoid receiving income in ways that required paying taxes. Thus, neither of them received a large salary. Rather, much of their compensation came in various other ways, including loans and other forms that were not immediately taxable. Sam's wife, Mary Naito (Mary), and Bill's wife, Millicent Naito (Micki), each worked for the business for over 15 years without receiving any salary, in part to avoid paying additional social security taxes. Mary was still working at the time of trial. Salaries for children working in the business were generally well below market rates for comparable positions, although they could receive informal compensation, such as living at McCormick Pier for little or no rent. The fringe benefits that the corporation provided to its employees, including members of the Naito family, were modest at best. The only corporate dividend came in 1982. Employment with the corporation was, as a practical matter, the only way that shareholders could receive any immediate benefit from their shares. Before Bill's death, there was a general understanding in the family that any member of the third generation[9] who wanted employment in the family business would receive it.

The corporation has two classifications of stock. There are presently 1,000 shares of class A stock, which have full voting rights. At Bill's death, Sam and Bill each owned 500 of those shares. Bill's shares passed to Micki, subject to a provision of the buy-sell agreement that we discuss below. There are also 29,380 shares of class B stock, which have no voting rights but are otherwise equal to the class A stock. At the time of Bill's death, Sam and his family and Bill and his

---

[9] Hide was the first generation of Naitos in the business, Sam and Bill are the second, and their children are the third.

family each owned one-half of the class B shares. The third generation received shares by gifts from Hide and from their respective fathers.[10] Each child now owns or controls significant amounts of Class B stock, as do Sam and Micki.[11]

Sam and Mary have three children: Ron Naito (Ron), Larry Naito (Larry), and Verne Naito (Verne). Ron is a physician who does not take an active role in the business. When Bill died, Larry was the general manager of Import Plaza. He worked for that entity throughout the liability phase of this litigation, but his employment terminated before the remedies phase began. Verne is a certified public accountant. Before Bill's death, he had not worked for the corporation in any significant way.

Bill and Micki have four children: Robert Naito (Bob), Steven Naito (Steve), Anne Naito-Campbell (Anne), and Kenneth Naito (Ken). Bob worked with his father in the real estate side of the family corporation, including handling relationships with its lenders, for about 20 years. He also operated an ice cream store in the Galleria. Beginning in 1994, he spent two years with another enterprise, but he returned to employment with the corporation a short time before Bill's death. Steve is a lawyer who had not worked for the corporation in any significant way before Bill's death. Anne began working at the Galleria shortly after college. In early 1998, she moved to the corporate headquarters to work in public relations. After Bill's death, and before she became a plaintiff in this case, she represented the corporation in various civic organizations. Ken worked at Montgomery Park for many years but now owns and operates restaurants in Washington state.

A problem that underlies many of the issues in this case is the question of what role that the members of the third generation of Naitos will play in the business and what

---

[10] Some of the gifts to Bill's children were in trust for the recipient's children, who are Bill's grandchildren.

[11] This is the situation described in the record before us. There was a question about the ownership of certificates covering 50 shares of class A stock and 700 shares of class B stock that Hide's widow, his second wife, found in a safe deposit box when she was appointed his conservator. Apparently that question was resolved in favor of Sam's and Bill's ownership. *See Naito v. Naito*, 125 Or App 231, 864 P2d 1346 (1993), *rev den* 318 Or 582 (1994).

benefits they will receive from it, given that generation's multiplicity of interests. Those issues existed before Bill's death. After his death, a series of events occurred that have resulted in Sam and one of his sons effectively running the business, with other members of the third generation working either in subordinate positions or having no role and receiving almost no benefits. The basic issue that we must decide is whether those events constituted an unlawful oppression of the minority shareholders that entitles plaintiffs to a remedy and, if so, what is the appropriate remedy.

Under the buy-sell agreement that Sam and Bill executed in 1980, the surviving brother upon the death of the other was entitled to purchase five class A shares from the estate of the other at a price established in accordance with the agreement. The agreement also requires the surviving brother's estate to sell those shares back to the holder or holders of the decedent brother's class A shares upon the surviving brother's death. The effect of the agreement, thus, is to give the surviving brother effective control of the corporation but to reestablish equal control between the families when the surviving brother dies. When Sam and Bill made the agreement in 1980, their children had either just entered the work force or were not yet in it.

Bill's death in 1996 came at one of the corporation's most difficult times. It had lost $3.3 million in the fiscal year ending June 30, 1996. Both Norcrest China and Import Plaza operated at losses, and it was not clear whether either would ever again be profitable. Although the corporation's books showed significant retained earnings, primarily, if not exclusively, from its retail operations, it was short of cash and heavily indebted.[12]

The real estate properties of the corporations were also seriously at risk at that time. The Galleria was in a state of decline and appeared to be worth less than the outstanding loan on it. McCormick Pier needed updating, flood repair, and increased occupancy. Montgomery Park had low lease

---

[12] The corporation had a policy of sheltering its retail earnings by investing them in real estate.

rates and significant vacancies and appeared to be over-staffed. There was a large loan on Montgomery Park that was also secured by the Old Town properties, and many of the corporation's assets were encumbered. The lender had required both Sam and Bill to give personal guaranties,[13] and Bill's death constituted an event of default under the terms of the loan. The terms of the loan also prevented the corporation from paying dividends.

After Bill died, there was a family meeting in June 1996. Although he had not yet received the controlling Class A shares, Sam was in effective control of the corporation. Although he promised at the meeting to operate the business fairly to everyone and suggested that it might begin paying dividends, Sam did not generally involve Bill's family in his decisions. Rather, he, Mary, and Verne believed that he had to defend himself from what they perceived as Bill's family's desire to dominate him as they believed Bill had done before his death. Two issues triggered the disputes that eventually led to this litigation. First, Steve asked for a job assisting Bob in the real estate part of the business in the summer of 1996. Despite the corporation's practice of providing employment to family members, Sam refused Steve's request unless Verne also came to work in a position comparable to Bob's role. Second, Micki failed to deliver the five controlling Class A shares to Sam, despite Sam's exercise of his option to purchase them under the buy-sell agreement. In addition, she refused to give her personal guaranty to replace Bill's guaranty, as the corporation's lender had requested.[14]

Members of the family held several meetings, with varying attendance, to discuss those and other issues relating to the future of the corporation. The meetings did not resolve anything but, instead, solidified factions among the shareholders. The firmest divisions were between Micki, Bob, and Steve (everyone began to refer to them as "MBS") and Sam and Verne. The divisions became particularly evident after meetings on August 16 and 23, 1996, to discuss

---

[13] When the lender required all directors to give personal guaranties, the third generation left the board rather than comply, leaving Sam and Bill as the only directors.

[14] Micki had also refused to give her personal guaranty during Bill's lifetime.

Steve's employment. At those meetings, Steve indicated that Micki would refuse to convey the five controlling shares because of technical flaws in Sam's exercise of his rights under the buy-sell agreement. Bob and Steve told Sam that he was not up to the task of running the business and that he should step aside so that they could operate it. To Sam and Verne, those statements were both insulting and an attempt to keep Sam in Bill's shadow.[15] MBS also sought to divide the company's assets among the shareholders rather than keeping the business together, as Sam preferred. Over the next two years, MBS insisted that the corporation take several business decisions that Sam opposed. As it turned out, those decisions would not necessarily have been advantageous.

Sam refused to provide Micki a stipend in recognition of Bill's service to the company and her years of unpaid employment. All of Bill's family believed that Micki deserved a stipend and that Bill and Sam had had an understanding that their widows would receive such compensation. In April 1997, the board of directors decided to pay Micki $3,000 a month. That decision came almost a year after Bill's death, and Bill's family believed that the amount was not enough. Moreover, there was no promise that the stipend would continue indefinitely. Those feelings continued after the board raised the amount to $5,000 in May 1998.[16]

Sam also refused to place Micki on the corporation's board, despite her ownership of almost half of the voting shares. In support of his refusal, Sam pointed to some confusion about whether Micki wanted to be a director or preferred to have Bob or Steve represent her on the board. In Sam's mind, having either Bob or Steve on the board was out of the question. It is clear, however, that Sam made no effort to resolve the confusion in a way that could have resulted in

---

[15] In December 1998, over two years later and shortly before the trial of this case, Ron wrote Sam encouraging him to take a conciliatory approach toward plaintiffs. Sam replied that Ron should remember that "they [MBS] started this unprovoked vicious confrontation on August 16, 1996 with the sole purpose of kicking me out and taking over the entire business."

[16] In February 1999, the trial court criticized the amount of the stipend at the conclusion of the liability phase of this case. In March 1999, the board agreed to increase the stipend to $8,000 per month and not to reduce it unless business conditions required a reduction of Sam's and Verne's compensation by the same percentage.

Micki's presence on the board; rather, he used it as an excuse to keep her off.

From late 1996 through early 1998, Sam and Verne made a number of significant decisions that both cemented Sam's control and contributed to a turnaround in the corporation's financial condition.[17] In October 1996, Sam, the sole remaining director, chose Larry and Verne to replace Bill on the board of directors. At the same time, Sam began gradually to reduce Bob's role in business operations, in part by taking advantage of the lack of clarity of Bob's role after his return to the business. Early in 1997, Sam finally received the five Class A shares that the agreement required Micki to sell him, thus giving him a majority of the voting stock and control of the corporation. By that time, Sam and Bob were communicating primarily by written notes, although their desks were only 10 feet from each other.

One reflection of the decline in Bob's role was that Verne began working part-time in January to help obtain a new line of credit for the corporation, something that would ordinarily have been Bob's responsibility. The event that precipitated Bob's resignation occurred during a meeting between Sam, Bob, and the officers of the bank that held the loan on Montgomery Park. At the meeting, Bob responded negatively to the bank's request for Micki's personal guaranty. In order to justify her continuing refusal to provide the guaranty, he criticized Sam's treatment of her. His conduct caused problems with the bank. Because of that event, and of Sam's withdrawal of his responsibilities and refusal to talk to him directly, Bob resigned his position soon afterwards, effective in early March. Sam refused to give Bob a severance payment, as he had requested. Also in early 1997, Ken, who was generally unsympathetic to Bob and Steve and sympathetic to Sam, began working part-time at Montgomery Park to help resolve its problems.

---

[17] Plaintiffs, with some support in the evidence, characterize Verne as a person who stimulated Sam's distrust of them and instigated many of the things about which they complain. It is clear that Sam and Verne worked closely together and that Verne's patent hostility toward MBS affected Sam's views. However, Sam made the ultimate decisions.

At the June 1997 shareholder's meeting, Sam used his voting control to elect a board that consisted of himself, Larry, Ken, Verne, and two new outside directors, David Kobos and John Rees.[18] Steve voted Micki's shares for Sam, Kobos, and Rees and against Larry, Ken, and Verne. The reconstituted board actively examined the issues that Sam and Verne presented to it. However, Sam and Verne established the board's agenda and, while the board tweaked their proposals, it did not question the underlying directions that Sam and Verne suggested. That characterization is particularly applicable to proposals concerning the relationship between the corporation and its shareholders.

Also at the June 1997 shareholders' meeting, the shareholders adopted a change in corporate governance that gave voting rights to the Class B shares if the Class A shares were deadlocked. As ORS 60.441 required, the Class B shareholders voted on the change; MBS voted against it, while all other shareholders who were present, including Ken and Anne, voted in favor of the change. Under the change, if there was a deadlock on any issue that was appropriate for shareholder decision, as was likely to occur after Sam died, the Class B shareholders would be able to vote on it rather than having the deadlock continue. Given the alignment of the Class B shareholders at the time of the change, the likelihood was that any resolution would not favor MBS.[19]

At the end of July 1997, Verne came to work full-time for the corporation as Sam's second in command. The terms of his contract, which the board approved after discussing and modifying the original proposal, included a salary that was closer to market level than the corporation had previously paid family members, along with significant severance payments if his employment were terminated. Sam's salary also increased so that it was closer to the market level. Finally, in September 1998 the board appointed Sam as president and Verne as vice-president and secretary, while at the

---

[18] Sam chose the outside directors because of their areas of expertise, Kobos in retail business and Rees in real estate. Rees subsequently resigned and was replaced by James Meyer.

[19] Among the third generation's members, only Verne and Bob are interested in running the corporation. The parties agree, however, that neither has any hope of receiving the support of a majority of the current Class B shareholders.

same time removing all other officers from office. Thus, Verne, as the only other officer, would be in charge of the corporation after Sam's death or resignation, while the severance provision would make it costly for the other shareholders to terminate his employment, as everyone anticipated that they would want to do.

Other family members' roles in the business declined during this period, Ken's work at Montgomery Park came to a natural end as the financial condition of the property improved, in large part due to his efforts. Under pressure from a number of sources, Sam agreed to shrink Import Plaza and to close it when the expiration of store leases and the reduction in inventory made it financially feasible to do so. That decision gradually reduced Larry's role as its general manager. Sam asked Larry to resign in August 1998, but Larry remained an employee until March 1999, when he received a substantial severance package. Several Import Plaza stores were still open at that time. In early 1998, Anne moved from the Galleria to corporate headquarters to become the corporation's public relations director. In September, Sam placed her on indefinite paid leave when she intervened as a plaintiff in this lawsuit. Larry and Ken remained as directors through the liability phase of the trial of this case; Sam replaced Larry with a third outside director in May 1999, in part because of Larry's testimony at the trial, which was not entirely favorable to Sam and Verne. Throughout this period, Ron and MBS played no role in the business except as shareholders.

The corporation reported a substantial profit for the fiscal year ending June 30, 1997, and it remained profitable throughout 1998 and 1999. A number of factors contributed to that result, including reduced operating losses from Norcrest China and Import Plaza. The primary factor, however, appears to have been a strong real estate market combined with improvements in the performance of Montgomery Park and other properties. Those improvements made possible the corporation's most significant financial achievement during these years: the negotiation of the refinancing of Montgomery Park in February 1998. That refinancing involved a loan that contained more favorable terms and also provided a significant cash infusion. Before the refinancing,

the corporation had substantial retained earnings on its books, but little available cash; afterwards it had more than $10 million in cash. The refinancing also removed the previous restriction on paying dividends. Although some of the cash was needed for deferred maintenance and capital projects, there was still a significant amount available for other purposes, including dividends.

From Bill's death in 1996 until the Montgomery Park refinancing in 1998, and particularly after Bob's resignation, MBS expressed concern about receiving no benefits from owning stock in the corporation. All attempts to resolve the issue by negotiating a division of the corporation failed.

In spring 1998, Anne asked Sam for a loan from the corporation to help with her family's financial needs. Although the corporation had previously loaned money to a number of family members, Sam refused her request. After some discussion, he offered instead to buy 100 shares of her Class B stock for $1,000 per share, telling her that the price was the actual value of the stock. The purchase took place in June 1998. After Anne intervened in this action as a plaintiff, she came to believe that the price was too low and that the effect of the sale was to give Sam's family a permanent majority of the Class B shares, thus giving it control of the corporation if a deadlock of the Class A shares occurred after Sam's death. Sam and Anne ultimately agreed that she could repurchase the shares for the price that he paid, and Anne borrowed money from Micki for the purpose.

In May 1998, after the refinancing, the board declared a dividend of $2 per share. At Sam and Verne's suggestion, Verne also began developing a stock repurchase program as the method of getting money to the complaining shareholders. Their explanation for taking that approach, rather than simply declaring a larger dividend, was that MBS had once suggested a repurchase plan and that some shareholders did not want the effect of double taxation from paying personal income tax on a dividend after the corporation had paid a corporate income tax on the profits that had made the dividend possible. Sam and Verne are the only shareholders whom defendants have identified as having that concern. On May 20, 1998, plaintiffs filed this law suit,

including claims against Sam for the breach of fiduciary duties owed to the minority shareholders. In August 1998, Sam and the corporation filed their answer, and in September 1998, Anne and her husband moved to intervene as plaintiffs.

Meanwhile, Verne spent some time developing a repurchase plan, which was the subject of board discussions. In January 1999, immediately before the beginning of the trial of this case and after plaintiffs had formally requested the payment of a dividend, the board adopted such a plan. Under that plan, the board created a fund of $3 million to be used for purchasing shares at $1,100 per share for Class B shares and $1,320 for Class A shares. The size of the fund made it impossible for any one of Bill's children to sell all of his or her Class B shares. In the event of a sale of fewer than all of an individual's shares, there was a significant possibility that the money that the shareholder received would be taxed as ordinary income rather than as a capital gain. At the same time, the board declared a second dividend of $5 a share.[20] At trial, Sam indicated that the board might consider a larger dividend if few or no shareholders accepted the repurchase offer.

The trial court divided the trial into liability and remedies phases. In February 1999, the court made extensive oral findings of fact at the end of the liability phase of the trial. It found that some of defendants' actions, particularly the failure to pay adequate dividends, constituted oppression of the plaintiff shareholders. In reaching that conclusion, it focused on the exclusion of plaintiffs from employment or other involvement with the corporation and on the corporation's failure to provide them any alternative financial benefit. Those actions also included what the court considered to be an excessively low offering price in the stock repurchase plan and the delay in providing Micki a stipend and then in only a very low amount. The court recognized that many of Sam's actions could be supported as reasonable business decisions when viewed in isolation, but it found that their net effect was to remove plaintiffs from any participation in the business of the corporation and sharing of its income. The

---

[20] The May 1998 and January 1999 dividends together totaled $212,660.

court then examined the corporation's dividend policy in light of what it concluded were the essential criteria discussed in *Zidell v. Zidell, Inc. (24128)*, 277 Or 413, 560 P2d 1086 (1977).[21] It ruled that, although Kobos and Meyer exercised independent judgment on the proposals that Sam and Verne made, they did not set their own agenda but instead went along with Sam's and Verne's oppressive dividend proposals. The court did not believe that the stock redemption plan was independently oppressive, but it reasoned that the plan was unfair in light of the dividend policy and the other factors in the case.

Between the court's findings at the close of the liability phase of the case in February 1999 and the beginning of the remedies phase of trial in late May, both the board and the shareholders made significant decisions. At a board meeting on March 22, 1999, Sam proposed a special dividend of $24 per share, or a total of $729,120. That amount still provided for a capital budget of $5 million for the next year. Larry sought a dividend of between $1.25 million and $1.5 million. After discussion, and with Larry abstaining, the board declared a dividend of $25, per share, or a total of $759,500. The board then unanimously adopted a dividend policy that it would follow in the future. Under the policy, management would recommend a dividend each year. The shareholders would then have an opportunity to give their opinions to a committee of directors who were not members of the Naito family. After that committee made its recommendation, the board would determine the amount of the dividend, if any. The board also resolved that, for the years 1999 through 2001, the dividend would be at least $500,000, provided that the corporation's net profit was at least $1.87 million.

The board also adopted an offer to purchase shares, with a pool that totaled $2.25 million. That amount represented the original $3 million pool less the approximate amount of the special dividend. The price for the offer was to be determined based on an appraisal of the corporation. The board appointed Kobos and Meyer as a committee to select the appraisers. It then increased Micki's stipend to $8,000

---

[21] We discuss *Zidell* and its relationship to this case later in this opinion.

per month, subject to reduction only if the corporation's financial circumstances required a reduction of the same percentage in Sam's and Verne's salaries. When Larry suggested adding Micki to the board, both Sam and Kobos said that that action would not be advisable during the pending litigation. The board also proposed repealing the provision for the Class B shares to vote if the Class A shares were deadlocked; Sam stated that he would vote in favor of the repeal, and the matter was referred to the shareholders. The meeting concluded by the board authorizing severance payments to Larry, in light of the impending closure of Import Plaza, that totaled $155,000.

At the annual shareholders' meeting on May 10, 1999, all of the Class A shares and a majority of the Class B shares voted to repeal the authority for Class B shares to vote in case of a deadlock. Ron and Ken did not attend, and Larry abstained. Sam then nominated a slate of directors that replaced Larry with a third nonshareholder director, who was unknown to the other shareholders. Sam voted his controlling shares in favor of the slate that he had nominated, while Micki abstained. The rest of the meeting consisted of an extensive discussion of the preparation for the new repurchase proposal and of the company's business affairs.

After the end of the liability phase of the trial in April 1999, plaintiffs filed a third amended complaint that added Sam, Verne, Meyer, and Kobos as defendants in their capacity as directors of the corporation. Shortly before trial, Ken moved to intervene in order to protect his interests. The court denied the motion, but Sam agreed that Ken would receive whatever remedy plaintiffs received.

At the beginning of the remedies phase of the trial in late May, defendants moved, purportedly pursuant to ORCP 64 C, to reopen the liability phase in order to offer evidence of the March 22 and May 10 meetings. The trial court denied the motion but agreed that the evidence was admissible on the remedies issues. At the conclusion of the remedies phase of the trial, the court found, in light of the amount of dividends that had been declared, the low price in the stock repurchase proposal, and the economic circumstances of the parties, that the amendment of the bylaws to permit Class B

shares to vote on a deadlock violated the implied duty of good faith and fair dealing under Bill's and Sam's buy-sell agreement. As a result of that change, the holder of Micki's Class A shares would not have received the 50 percent voting rights that the agreement contemplated on Sam's death. Based on that conclusion, the court ordered that Sam pay Micki's attorney fees related to her claim under that agreement.

The court then turned to the issue of dividends. It noted that the corporation had over $11 million in cash available, that it had future capital needs for maintenance and expansion, and that there was $3 million available to fund a stock repurchase plan that could be used instead for dividends. In that regard, the court stated its belief that, generally, a real estate company's net income is unrealistically reduced by depreciation, a reduction that does not reflect economic reality, and that, therefore, there is more cash available for dividends than might otherwise be apparent.[22] Based on those findings, the court ordered the corporation to pay dividends of $710,000 per year for each of the five years beginning in 2000, so long as it had $1.3 million in net profits from the previous year.[23]

In its judgment, the court also enjoined Sam for a period of five years from voting his Class A shares in ways that would affect the rights of Micki's Class A shares, unless Micki or her successor consented. It also enjoined the corporation from issuing additional Class A shares without her consent. It retained jurisdiction for five years for issues concerning dividends, the estate planning of Class A shareholders, and amendments to the articles of incorporation concerning Class A shares. It authorized an award of attorney fees to Micki. Finally, it dismissed all of plaintiffs' other claims with prejudice.

On appeal, defendants challenge the judgment in its entirety. We begin with their seventh assignment of error, because it affects the evidence that we consider in the rest of

---

[22] There is no evidence in the record relating to those beliefs.

[23] The court stated that, if the appellate court agreed that there was oppressive conduct but disagreed with its dividend remedy, the appropriate alternative was a divisive reorganization that would lead to two or more new companies, each controlled by separate groups of the existing shareholders.

this opinion. In that assignment, defendants argue that the trial court erred by denying their motion to reopen the liability phase of the case in order to consider the decisions that the board took at its March 22 meeting. Defendants correctly point out that the motion was not for a new trial under ORCP 64 C but, rather, was a motion to reopen for additional evidence.[24] We review such motions for an abuse of discretion, *Lee v. Yang*, 163 Or App 520, 525, 987 P2d 519 (1999), *rev den* 329 Or 607 (2000), and find no abuse here. What defendants sought to introduce was not newly *discovered* evidence but newly *created* evidence. The evidence came into existence in response to the trial court's findings in the liability phase, and the court could properly refuse to consider it on the issues that the court had already decided. Even if the court had admitted the evidence, we would give it little or no weight on the issue of liability. The gravamen of plaintiffs' claims occurred before the litigation began, and the board's curative actions thereafter can be viewed as efforts to avoid the effect of the court's findings of oppressive conduct.[25]

■ We turn to the primary issue on appeal: whether plaintiffs have proved their claim of majority oppression of minority shareholder interests. Much of the law in this regard is well-established. Majority or other controlling shareholders owe fiduciary duties of loyalty, good faith, fair dealing, and full disclosure to the minority. *Delaney v. Georgia Pacific Corp.*, 278 Or 305, 310-11, 564 P2d 277 (1977). Directors owe similar duties to the corporation.[26] At least in closely held corporations, conduct that violates those duties is likely to be oppressive under ORS 60.661(2)(b),[27]

---

[24] ORCP 64 A provides that a "new trial is a re-examination of an issue of fact in the same court after judgment." Defendants made their motion before the trial was over.

[25] As we discuss below, we do give the board's March 1999 actions weight with regard to remedies.

[26] The distinction between controlling shareholders and directors may not be of great significance in this context. The proper focus is on those who are actually in control of the corporation, whatever their specific roles. *See Zidell*, 277 Or at 418 (describing fiduciary duties of those in control of corporation before discussing actions of directors in declaring dividends).

[27] ORS 60.661(2)(b) provides that a circuit court may dissolve a corporation in a proceeding brought by a shareholder if it is established that "[t]he directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive or fraudulent."

thus authorizing a court to dissolve the corporation or order some lesser remedy. *See, e.g., Baker v. Commercial Body Builders*, 264 Or 614, 628-29, 507 P2d 387 (1973); *see also Cooke v. Fresh Express Foods Corp.*, 169 Or App 101, 108-09, 7 P3d 717 (2000); *Chiles v. Robertson*, 94 Or App 604, 619-20, 767 P2d 903, *on recons* 96 Or App 658, 774 P2d 500, *rev den* 308 P2d 592 (1989). As we noted in *Chiles*, the heart of a corporate fiduciary's duty is an attitude, not a rule. "The fiduciary best fulfills its duties if it approaches them with the attitude of seeking the beneficiary's interests rather than the personal interests of the fiduciary[.]" 94 Or App at 619.

Plaintiffs' principal argument is that they have been excluded from all participation in the corporation and all other benefits of owning their stock. Plaintiffs have certainly shown that they do not have the involvement in or the influence on corporate policy that they once had. What they do not fully accept, however, is that the diminution in their role is the result of the terms of the buy-sell agreement between Sam and Bill. Bob, Steve, and, to a lesser extent, Micki, did not fully accept that under the terms of the buy-sell agreement Bill's death changed the power relationships in the corporation. Their use of a technical excuse to delay delivering the five control shares and their actions at the August meetings provoked a response from Sam that led to a breakdown of relations. Their insistence thereafter that the corporation take actions that Sam did not want to take—some of which would, in fact, have had negative results—continued the problem. Viewing a number of the actions about which plaintiffs complain in the context in which they occurred answers plaintiffs' claim that Sam's earlier actions were oppressive. Sam had the legal right to exercise the authority that the buy-sell agreement gave him after Bill's death. In light of MSB's challenge to that authority, it is not surprising that Sam did not want Steve to work with Bob, at least unless Sam could have Verne as his supporter. It is also not surprising that Sam began to withdraw responsibilities from Bob and that their relationship deteriorated. Bob's resignation was the result of his deteriorating relationship with Sam and of his own action in responding to a bank request in a way that supported Micki and harmed the corporation. We are not persuaded that Sam's actions in those regards are the

kind of conduct that the law treats as oppressive conduct against minority interests.

In the same manner, the decision to allow Class B shareholders to break a deadlock after Sam's death was a practical solution to a real problem. That action did not ensure that Sam's family would control the corporation after his death. Anne and Ken, two of Bill's children, voted for the change, while the relationship between Ron and Larry, on the one hand, and Verne, on the other, was such that it was unlikely that they would constitute a solid block for any future decisions. Rather, it was probable that the Class B shareholders could form a variety of alliances and that those alliances could cross family lines. In this light, Sam's subsequent purchase of 100 of Anne's Class B shares was unlikely to affect the future balance of power. Again, we are not persuaded that plaintiffs have carried their burden in regard to those decisions. Finally, the delay in giving Micki a stipend, and the amount once the corporation gave it, may be evidence of Sam's unwillingness to deal generously with her or to abide by an agreement with Bill, but it is not oppression of her in her capacity as a shareholder.

By early 1998, however, the financial picture of the corporation had changed. The financial justifications for the minority shareholders not receiving benefits from their ownership interests began to lose force. Attempts to divide the corporation's assets among the parties had foundered and continued to founder, in large part because of the hard line that Sam and Verne took in the negotiations.[28] At the same time, the corporation was profitable and, after the Montgomery Park refinancing, it had substantial cash reserves with no limitations on paying dividends other than providing prudent reserves for its future business needs. Although the corporation faced significant expenditures for deferred maintenance and capital projects, it had over $5 million in retained earnings after allowing for those expenditures. At the time, the corporation did not contemplate any new ventures that would call for extraordinary resources.

---

[28] In reaching this conclusion, we do not consider the evidence that is the subject of one of defendants' assignments of error.

Under these circumstances, there was no justification in 1998 for failing to make a significant distribution to the shareholders beyond the token dividends that the corporation declared. Rather than issuing dividends that reflected the value of the corporation, the board adopted a stock repurchase plan that would permit dissident shareholders to sell some of their shares to the corporation. On appeal, defendants justify their decision by arguing that certain shareholders had expressed an interest in selling their shares and that others did not want the double taxation effect of a dividend. The evidence does not support either contention. At most, the evidence is that Ken suggested that a regular dividend *combined with* some way for shareholders to liquidate some of their shares might resolve the parties' problem. Anne's attorney also indicated that she would accept a redemption of *all* of her shares as an "exit" strategy, but there was no indication that any minority shareholder would agree to dilute his or her interests by participating in a partial buyout. As to the second argument, that some shareholders wanted to avoid double taxation of their dividends, the evidence shows that that concern applied only to Sam and Verne themselves.

The repurchase plan that the board adopted shortly before the trial began was limited to a $3 million fund with no suggestion that additional amounts would follow. That amount was too small for the corporation to purchase all of the shares that any shareholder except Micki owned. Thus, any shareholder other than Micki who accepted the offer would receive money that might be subject to tax as regular income. Because Sam and Verne did not intend to sell any of their shares, the sale would increase their proportionate interest in the corporation and reduce the interest of a shareholder who sold. If Micki sold her Class A shares, Sam's heirs would continue to control the corporation after Sam's death. If any shareholder sold Class B shares, Verne and Sam's heirs would be more likely to prevail in any deadlock. Thus, the repurchase plan would have, in effect, frustrated the purpose of returning the ownership interests to parity at the time of Sam's death. Finally, we agree with the trial court

that the offering price in the plan was, at best, on the low end of a reasonable range.[29]

This offer, with all its problems, was the only way that the corporation provided for the minority shareholders to receive any substantial value from their shares. We conclude that the repurchase offer did not constitute a good faith effort on the part of the board to provide a reasonable portion of the corporation's income to the shareholders, nor does it justify the failure to pay adequate dividends. By failing to provide for adequate dividends or other financial benefits on reasonable terms, Sam acted for his own self-interest in derogation of the interests of the minority shareholders and therefore failed to act with the fiduciary attitude that we described in *Chiles*.

Defendants argue that there is no evidence that a majority of the board shared whatever motives Sam and Verne had and that, as a result, it is improper to attribute their actions to the board as a whole. They point out that the board, not the controlling shareholder, has the authority to declare a dividend and that the court in *Zidell*[30] focused on the actions of the directors, not of the shareholders, in determining whether the corporation's dividend policy was oppressive. Defendants conclude that, because the board actively participated in the challenged decisions, and because a majority of the board did not share Sam's and Verne's animus towards plaintiffs, it necessarily follows that the board's decisions were made in good faith and are beyond challenge. However, the Supreme Court, in its opinion in *Zidell*, emphasized the fiduciary duties of "those in control of corporation affairs," including that decisions concerning dividends be

[29] In justifying the offering price, defendants argue that it was appropriate to apply a substantial marketability discount to the value of the shares. Thus, they concede, in effect, that the offering price was substantially less than the value attributed to the unsold shares, which would increase in value with every share sold.

[30] *Zidell* was a suit to require corporations to declare greater dividends. Because the primary remedy that the trial court ordered in this case was to require the corporation to declare dividends at a certain level, the parties appear to assume that *Zidell* is controlling in this case. There may well be a distinction between dividends as a remedy for a variety of oppressive conduct and dividends as the sole purpose of the action, but we will accept their assumption for the purposes of this case.

made in good faith and reflect "legitimate business purposes rather than the private interests of those in control." 277 Or at 418. In *Zidell*, the corporate boards consisted of the two controlling shareholders and a former shareholder who was aligned with them. There was, thus, no distinction between the directors and those in control of the corporations.

Here, the board consists of Sam and Verne, two non-aligned shareholders, and two nonshareholders.[31] However, Sam and Verne were the driving force behind the board's decision to pay only nominal dividends and to focus instead on a share repurchase plan. Sam and Verne developed the structure of that plan. The other directors played only minor roles in deciding either the general direction or the details of that decision. As with other board actions, Sam and Verne set the agenda and provided most of the information on which the board acted. Thus, Kobos and Meyer each believed that shareholders wanted an opportunity to sell their shares, but neither appears to have known that those shareholders viewed a sale either as part of a package that provided other benefits for their shares or as a way to withdraw entirely from the corporation. Although Kobos and Meyer partici-pated in determining the size of the repurchase fund, they did not independently determine a fair offering price but, rather, relied on Larry or Ken to object if Sam and Verne's proposal was too low.[32] The token $5 dividend that the board approved at the same time was also Sam's idea, which the board accepted. Consequently, we reject defendants' argu-ment that the board's adoption of Sam's and Verne's proposal insulates the corporation and Sam from liability.

We turn to the question of the appropriate remedy. In their cross-appeal plaintiffs challenge the trial court's decision to order increased dividends and argue, rather, that

---

[31] In their briefs, defendants several times refer to Larry and Ken as aligned with plaintiffs. We disagree. Both Larry and Ken sought to avoid identification with either side and, rather, worked to resolve the differences. That they failed to give Sam and Verne total and unquestioning support does not mean that they were partisans for MBS.

[32] Ken, who had once suggested that a repurchase might be part of a package that would satisfy MBS, stated at the January 7, 1999, board meeting that he did not wish the board to consider a repurchase offer. He voted against the offer, and Larry abstained. Each stated that he would support an offer that was limited to Class B shares.

the appropriate remedy is a divisive reorganization. In other cases, we have ordered the controlling party to purchase the minority's shares at their undiscounted fair value. *See, e.g., Cooke*, 169 Or App at 114-15; *Chiles*, 94 Or App at 640, 643. As we have noted, ORS 60.661(2)(b) grants the court authority to dissolve a corporation if those in control have acted in an oppressive manner. However, a court may order a less severe remedy than dissolution under the statute. *See Baker*, 246 Or at 631-33. In this case, we do not believe that the oppressive conduct is so egregious that it requires the drastic remedy of a compulsory purchase or divisive reorganization. The record indicates that the business is being run well under Sam's control. We agree with the trial court that the proper remedy is to keep the business together for the benefit of all the shareholders but to require it to pay reasonable dividends.

Defendants also argue that the facts of this case do not satisfy the *Zidell* criteria for ordering the payment of dividends. Assuming that *Zidell* is controlling, we believe that such an order is appropriate. In *Zidell*, the plaintiff was a minority shareholder, director, and employee of several closely held corporations. The controlling shareholders were his brother and his brother's son. The plaintiff believed that his salary was too low and, after the directors refused to raise his salary, resigned his employment. He was not re-elected to the boards when his terms expired. Before his resignation, the corporations had not paid dividends because all shareholders were employees and received income through their salaries. Afterward, the plaintiff demanded that they declare reasonable dividends. The corporations did declare dividends, but the plaintiff believed that they were unreasonably small and not set in good faith. He filed the lawsuit in order to compel larger dividends. The trial court granted the relief that he requested.

In reversing the trial court, the Supreme Court explained that, so far as dividends are concerned, those in control of corporate affairs discharge their fiduciary duties toward the minority shareholders if they make such decisions in good faith and the decisions reflect legitimate business purposes rather than the controlling parties' private interests. As the court said, " '[i]*f there are plausible business*

*reasons supportive of the decision of the board of directors, and such reasons can be given credence, a Court will not interfere with a corporate board's right to make that decision.'"* 277 Or at 419, *quoting Gay v. Gay's Super Markets, Inc.*, 343 A2d 577 (Me 1977) (emphasis added by Oregon Supreme Court). The court then held that the facts did not justify ordering the payment of dividends.

■        The facts in this case are different from those in *Zidell* and lead to a different result. By February 1998, when it became possible to declare dividends, Sam and Verne were in day-to-day control of the corporation. For various reasons, many of which we have described, they were hostile to MBS. Although Anne had generally supported Sam, once she intervened in this case they immediately extended that hostility to her. Their only attempt to provide substantial benefits to the minority shareholders consisted of a stock repurchase program that, as structured, was more beneficial to their interests than to the minority interests. Although the corporation had the financial capability to pay substantial dividends out of current profits, Sam and Verne supported only what were, in fact, token dividends. In an effort to justify those actions shortly before trial, they expanded the corporation's legitimate needs for deferred maintenance and capital projects into what the parties called "Verne's wish list," a listing of projects that was designed more to use up the available cash on paper than to be a realistic assessment of what the corporation intended to do. In light of their actions, we hold that requiring the corporation to pay increased dividends is an appropriate remedy.

■        Although we agree with the trial court that increased dividends are the appropriate remedy, we believe that the trial court failed to give adequate weight to the board's determination at its March 22, 1999, meeting of how to determine the amount of those dividends.[33] Courts are generally reluctant to interfere with the exercise of business discretion by

[33] As a result of the trial itself, the context in which the board made that decision was quite different from what it had been earlier. The trial, and in particular the trial court's findings, gave the nonshareholder directors a better understanding of the minority shareholders' concerns and legitimate interests, while Sam and Verne appear to have gained some insight into the limitations on their authority. In many ways, the most important aspect of the March 1999 dividend policy is not

the officers and directors of a corporation. *See McMunn v. ML&H Lumber*, 247 Or 319, 323-24, 429 P2d 798 (1967); *Jackson v. Nicolai-Neppach Co.*, 219 Or 560, 587, 348 P2d 9 (1959). Although courts will not ignore corporate misconduct, it is not their role to second-guess business decisions that are within the range of reasonableness. The policy that the board adopted at the March meeting established a procedure that involves significant consultation with plaintiffs and the other minority shareholders for determining the amount of future dividends, and it promises a minimum payment if the corporation achieves a designated level of profitability. Determining what is an adequate dividend requires an exercise of business judgment based on considerations that include the corporation's future needs and likely future profitability.[34] Determining those factors involves predicting such matters as changing market conditions, probable capital and maintenance requirements, future corporate opportunities, civic projects, and many other things that go toward the success of a business. The people who are usually in the best position to exercise that judgment, and who have the responsibility for doing so, are the corporation's management and directors. The trial court rejected the board's policy and, instead, applying its own view of the corporation's needs, required the corporation to pay larger dividends based on a smaller profit than the board had promised. In doing so, the court improperly substituted its judgment for that of the board.

The fact that we approve the policy adopted by the board in March 1999 does not, however, mean that there is no continuing role for the trial court. In light of the years of hostility between the parties and our finding of oppression, it is important to ensure that the policy works as the board apparently intended it to work. For that reason, the trial court on remand will modify the judgment by deleting the current provision concerning dividends and replacing it with a provision

the specific amounts involved but the inclusive process that it established. We expect that, if the board as a whole follows that process in good faith, there will be fewer problems concerning dividends and other benefits to the minority shareholders.

[34] The record does not indicate the nature or result of the second repurchase offer. We have no occasion to consider the proper use of the $2.25 million pool that the board established for that offer if it turns out that the shareholders rejected it as they did the first.

requiring defendants to adhere to the dividend policy adopted on March 22, 1999, for a period of five fiscal years, beginning with fiscal 2000, and retaining continuing jurisdiction over the implementation of that policy.[35]

Defendants next assign error to the trial court's finding that they violated the buy-sell agreement, and the implied obligation of good faith and fair dealing that is part of it, and to the accompanying award of attorney fees. It appears that the effect of agreeing with this assignment would be to reverse the portions of the judgment requiring Micki's election to the board, restricting the issuance of new Class A shares, requiring Micki's approval of any new arrangement for Class B shares to have voting rights, and awarding her attorney fees payable by the corporation. The basis for plaintiffs' claim is the adoption of the provision permitting Class B shares to break a deadlock in the Class A shares. We have already found that that provision was not oppressive. We now find that it did not violate the buy-sell agreement.

■    One obvious purpose of the buy-sell agreement was to permit the surviving brother to control the corporation during his lifetime. In exercising his rights under the agreement to purchase the controlling Class A shares, and in exercising his control over the corporation, Sam has done precisely what he and Bill intended him to be able to do. The agreement, however, does not deal with the situation that will occur after Sam's death, when the corporation's control

---

[35] We emphasize that the essential aspect of the board's policy, in our view, is its provision for a committee of nonshareholder directors to recommend the amount of a dividend and for minority shareholders to participate in that committee's decision. That procedure provides a formal mechanism for the board to take the minority shareholders' interests into account in setting dividends. It does not prevent the board from basing its decision on dividends, or on other matters relating to the corporation's business, on its view of the best interests of the business as a whole. Aside from the board's stated intention to provide dividends of at least $500,000 if the corporation's income is at least $1.87 million, the policy does not commit the board to any particular level of dividend. If the board carries out this policy as intended, we would not anticipate any further breaches of fiduciary duty in this respect. In order to ensure that the policy does provide the protection to plaintiffs that we believe it will, the judgment will require the board to adhere to it for five years and will provide for the trial court to retain jurisdiction during that period to ensure proper implementation of the policy.

will again be equally divided between the families. Permitting the Class B shares, which are also equally divided between the families but are more widely held, to break any deadlock was a reasonable response to a potentially serious problem. It is not inconsistent with the letter or the spirit of the agreement that Sam and Bill reached; rather, it fills a gap in that agreement. Because there was no breach of the agreement, the court erred in requiring the election of Micki to the board and in limiting actions concerning the rights of different classes of shares.[36] As a result, the award of attorney fees to her must be vacated.

Our previous discussion has resolved all issues raised in plaintiffs' cross-appeal. We reject the remainder of the parties' arguments without further discussion.

On appeal, judgment vacated and remanded with instructions to enter judgment limited to requiring defendants, for five consecutive fiscal years of defendant corporation beginning with fiscal year 2000, to implement in good faith the dividend policy adopted on March 22, 1999, and retaining jurisdiction to enforce the judgment; affirmed on cross-appeal.

---

[36] We note that Sam agrees that Micki should be a member of the board once this litigation is resolved. Because no one has suggested issuing additional Class A shares, we do not need to decide at this point whether attempting to do so would breach either the express terms of the buy-sell agreement or the implied obligation of good faith and fair dealing that it contains. It appears from the record that the corporation has issued all of the Class B shares that are currently authorized.