No. 61 November 30, 2017 177

IN THE SUPREME COURT OF THE
STATE OF OREGON

GRAYDOG INTERNET, INC.,
an Oregon corporation,
*Respondent on Review,*

*v.*

David GILLER,
*Petitioner on Review.*

David GILLER,
*Petitioner on Review,*

*v.*

Douglas WESTERVELT,
*Respondent on Review.*

(CC 130506470, CA A156539, SC S064346)

On review from the Court of Appeals.*

Argued and submitted May 11, 2017.

Colin M. Murphy, Southern Oregon Public Defenders, Medford, argued the cause for the petitioner on review. Gary M. Bullock, Gary M Bullock & Associates PC, Portland, filed the briefs for the petitioner on review.

Susan Marmaduke, Harrang Long Gary Rudnick PC, Portland, argued the cause and filed the brief for the respondent on review. Also on the brief were Nathan Robert Morales and C. Robert Steringer.

Before Balmer, Chief Justice, and Kistler, Walters, and Nakamoto, Justices, and Armstrong, Judge of the Court of Appeals, Justice *pro tempore*.**

BALMER, C. J.

_____

* Appeal from Multnomah County Circuit Court, Henry C. Breithaupt, Judge *pro tem*. 279 Or App 722, 381 P3d 903 (2016)

** Brewer, J., retired June 30, 2017, and did not participate in the decision of this case. Landau, Flynn, and Duncan, JJ., did not participate in the consideration or decision of this case.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed, and the case is remanded to the circuit court for further proceedings.

**BALMER, C. J.**

Under ORS 60.952(6), when a shareholder in a closely held corporation files a certain type of proceeding, the corporation or another shareholder may respond with an election to purchase for fair value all of the shares of the shareholder who filed the proceeding and proceed to acquire those shares. This case presents the question of when, if ever, the filing of a third-party complaint constitutes the "filing of a proceeding under subsection (1)" of that statute, such that the shareholder who filed the proceeding may be bought out by the corporation or another shareholder. The corporation here, Graydog Internet, Inc., has only two shareholders: Westervelt, the company's president and majority shareholder, and Giller, an employee and minority shareholder. Graydog initiated the underlying case, at Westervelt's direction, when it filed a declaratory judgment action against Giller raising an issue regarding his employment. As part of his response, Giller filed a third-party complaint against Westervelt. Graydog then filed an election to purchase Giller's shares under ORS 60.952(6). Giller objected, arguing that filing a third-party complaint does not constitute the "filing of a proceeding" as that term is used in ORS 60.952(6) and that the claims in the third-party complaint were not "under [ORS 60.952(1)]." For those reasons, Giller asserted, Graydog could not elect to purchase his shares. We agree that ORS 60.952(6) does not apply to Giller's third-party complaint, and therefore reverse the decision of the Court of Appeals.

## I.   FACTS

Westervelt and Giller founded Graydog in 1997. Since incorporation, Westervelt has been the majority shareholder and Giller has been the minority shareholder. Both have been active in the management and operation of the firm. Their cooperation was fruitful and the company grew.

Eventually, however, Westervelt and Giller disagreed about aspects of their venture together. At some point, Westervelt offered to buy out Giller, but Giller refused to sell. A provision in a shareholder agreement among Graydog, Westervelt, and Giller allowed Graydog to purchase the

shares of any shareholder who ceased to be employed by Graydog. To that end, Westervelt directed Graydog to file a declaratory judgment action against Giller seeking a declaration of his status as an at-will employee and Graydog's right to terminate Giller's employment.

Giller responded with an answer and counterclaims against Graydog. He also filed a third-party complaint against Westervelt personally. The third-party complaint asserted claims for

> "(1) a declaration that the 'shareholder agreement is void and unenforceable,' (2) 'breach of contract' based on Westervelt allegedly violating the corporate bylaws by 'tak[ing] unilateral action in his personal capacity and for his personal interests,' and (3) 'breach of [the] contractual duty of good faith and fair dealing' based on Westervelt allegedly 'having acted for the sole purpose of trying to force [Giller] to unwillingly sell his shares to him.'"

*Graydog Internet, Inc. v. Giller*, 279 Or App 722, 725, 381 P3d 903 (2016) (first and second brackets in *Graydog Internet, Inc.*). In support of those claims, Giller alleged:

> "Westervelt loaned himself $20,000 from the company without the board's approval; Westervelt elected his wife to the board of directors over Giller's objection; Westervelt threatened to force Giller to sell his shares if Giller did not agree to do so voluntarily, and had an attorney prepare and file Graydog's complaint to terminate Giller's employment before the board of directors voted on the proposal. * * * Giller alleges that Westervelt took all of those actions 'for his personal interests' and harmed Giller as a result."

*Id.* at 734.

In response to the third-party complaint, Graydog—controlled by Westervelt—filed an election to purchase all of Giller's shares pursuant to ORS 60.952(6), setting up the issue now before us.

Subsection (6) of ORS 60.952 applies when a shareholder in a closely held corporation "fil[es]" a "proceeding under subsection (1)." ORS 60.952(1) identifies the grounds for liability that a shareholder in a closely held corporation must "establish[]" before a court will grant certain relief

against the corporation or another shareholder: that the directors or shareholders are deadlocked; that the directors have acted in an illegal, oppressive, or fraudulent manner; or that waste has occurred.[1] Once a shareholder establishes liability, a court "may order one or more of the remedies listed in subsection (2)." ORS 60.952(1). When a shareholder files a proceeding under ORS 60.952(1), "the corporation or one or more shareholders may elect to purchase all of the shares owned by the shareholder who filed the proceeding for their fair value." ORS 60.952(6).[2] That process—a defendant corporation or a shareholder in the defendant corporation electing under ORS 60.952(6) to purchase the shares of the shareholder who filed the proceeding—is referred to as an "election." As discussed below, as a result of the election provision, when a shareholder files a proceeding under ORS 60.952(1), in addition to seeking damages or other relief under ORS 60.952(2), the shareholder in effect makes an offer to sell all of its shares, for fair value, to the corporation

_____

[1] ORS 60.952(1) provides:

"In a proceeding by a shareholder in a corporation that does not have shares that are listed on a national securities exchange or that are regularly traded in a market maintained by one or more members of a national or affiliated securities association, the circuit court may order one or more of the remedies listed in subsection (2) of this section if it is established that:

"(a) The directors are deadlocked in the management of the corporate affairs, the shareholders are unable to break the deadlock and irreparable injury to the corporation is threatened or being suffered, or the business and affairs of the corporation can no longer be conducted to the advantage of the shareholders generally, because of the deadlock;

"(b) The directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive or fraudulent;

"(c) The shareholders are deadlocked in voting power and have failed, for a period that includes at least two consecutive annual meeting dates, to elect successors to directors whose terms have expired; or

"(d) The corporate assets are being misapplied or wasted."

[2] ORS 60.952(6) provides, in part:

"At any time within 90 days after the filing of a proceeding under subsection (1) of this section, or at such time determined by the court to be equitable, the corporation or one or more shareholders may elect to purchase all of the shares owned by the shareholder who filed the proceeding for their fair value."

The remainder of the provision details the procedures for the election, determination of the purchase price, involvement by the court, and related matters. *See* ORS 60.952(6)(a) - (f) (setting out procedures and timelines for purchase of shares).

or another shareholder, without resolving the merits of the complaint or other proceeding that the shareholder filed.

We return to the facts of the case. After Graydog filed an election, Giller objected to it. Graydog and Giller then filed cross-motions for partial summary judgment contesting the legality of Graydog's election under ORS 60.952(6). The parties disputed two issues under ORS 60.952(6): whether filing a third-party complaint constituted the "filing" of a "proceeding" and whether the claims in Giller's third-party complaint were actually "under" ORS 60.952(1). On the first point, Giller asserted that the election procedure is available only to the party defending against a proceeding brought by another, and not to the party that initiated the proceeding in the first place. He argued that it was Graydog and Westervelt that had initiated the litigation and that his answer, counterclaim, and third-party complaint were simply defensive responses to Graydog's complaint. Graydog responded that "proceeding" in ORS 60.952(6) can mean an "action or step that is part of a larger action" and, therefore, that the third-party complaint filed by Giller was a "proceeding" that Giller had "filed."

On the second issue, Giller argued that his third-party complaint was not actually "under" ORS 60.952(1), because he had not asserted a claim for relief from "illegal, fraudulent or oppressive" conduct, the standards for liability in ORS 60.952(1)(b), nor had he sought one of various equitable remedies identified in ORS 60.952(2). Rather, Giller argued, he had simply responded to Graydog's complaint and asserted an appropriate contract-based claim against the majority shareholder who controlled Graydog, seeking money damages and a declaratory judgment. Graydog replied that the true nature of Giller's claim was revealed by the conduct alleged in the complaint, which appeared to show that Westervelt had acted in an oppressive and illegal manner, although Giller did not use those words. Because "illegal" and "oppressive" conduct creates liability under ORS 60.952(1), Graydog asserted, Giller's claims were actually "under" ORS 60.952(1).

After argument, the trial court entered a limited judgment stating:

"1.   ORS 60.952(6) does not apply to this case because ORS 60.952(6) may be triggered only against one who commences an action, not against a party who files counterclaims or a third-party complaint.

"2.   ORS 60.952(6) does not apply to this case for the further reason that the claims made by Mr. Giller are not of the type described in ORS 60.952."

Graydog and Westervelt appealed that judgment to the Court of Appeals.

At the Court of Appeals, Graydog and Westervelt challenged both conclusions of the trial court. They argued that the text and context of ORS 60.952(6) indicate that a party who files a third-party complaint has filed a "proceeding" for the purposes of the statute, citing a number of Oregon cases suggesting that a "proceeding" can mean a part of a lawsuit, such as a third-party complaint. They also argued that Giller's claims were the type of claims described in ORS 60.952(1) that could trigger the right of the corporation or another shareholder to make an election under the statute to purchase the filing shareholder's shares.

Giller argued that filing a third-party complaint was not the "filing of a proceeding" under the statute. He contended that the legislative history indicates that the legislature intended ORS 60.952(6) to be "a remedy, not a weapon." By allowing a majority shareholder to commence litigation against a minority shareholder and then, after the defendant has responded by answer, counterclaim, or third-party complaint, use ORS 60.952(6) to buy out the latter, as Giller asserted that Graydog and Westervelt were attempting to do here, ORS 60.952(6) would become a weapon for majority shareholders seeking to oust minority or dissenting shareholders. Giller also reprised his argument that the claims in the third-party complaint were not the type of claims described in ORS 60.952(1) that could trigger an election.

The Court of Appeals agreed with Graydog and Westervelt and reversed the trial court. The court first considered the meaning of the phrase "filing of a proceeding" as used in ORS 60.952(6). The court noted that "proceeding" for

purposes of ORS chapter 60 is defined as "a civil, criminal, administrative or investigatory action." ORS 60.001(24). It cited several cases where this court described "third-party complaints as a separate civil action" from the cases in which they were filed and concluded that filing a third-party complaint was the "filing of a proceeding." *Graydog Internet, Inc.*, 279 Or App at 729.

The court then considered whether the claims in Giller's third-party complaint were claims "under subsection (1)" of ORS 60.952. To determine the "true nature" of Giller's claims, it applied a standard for determining the application of the correct statute of limitations set out in *Htaike v. Sein*, 269 Or App 284, 344 P3d 527, *rev den*, 357 Or 595 (2015). *Graydog Internet, Inc.,* 279 Or App at 731. Under the *Htaike* standard, whether a claim properly sounds in tort or contract depends on the "legal source of the defendant's liability, the factual setting of the dispute, the injuries asserted by the plaintiff, and the plaintiff's claimed measure of damages." *Id.* at 732. The Court of Appeals applied that standard and concluded that "the real character of at least some of Giller's third-party claims is a claim for oppression under ORS 60.952(1)." *Id.* It reversed both conclusions of the trial court, clearing the way for Graydog's purchase of Giller's shares. Giller sought review in this court.[3]

## II.  ANALYSIS

The issue here is the circumstances in which the filing of a pleading by a shareholder in a closely held corporation constitutes the "filing of a proceeding under [ORS 60.952(1)]" such that the shareholder who files the pleading may be bought out by the corporation or another shareholder under ORS 60.952(6). We note at the outset that the text of the statute does not clearly resolve that question. To repeat, ORS 60.952(6) provides, in part:

"At any time within 90 days after the filing of a proceeding under subsection (1) of this section, or at such time determined by the court to be equitable, the corporation or

---

[3] As noted, both Graydog and Westervelt filed notices of appeal from the trial court's limited judgment. Their arguments are identical and, except where necessary to refer to Westervelt separately, we refer to respondents on review as "Graydog."

> one or more shareholders may elect to purchase all of the shares owned by the shareholder who filed the proceeding for their fair value."

As noted, subsection (1) imposes liability where the directors or shareholders are deadlocked; the directors have acted in an illegal, oppressive, or fraudulent manner; or waste has occurred. If a shareholder establishes such conduct, a court may order one or more remedies listed in ORS 60.952(2), ranging from money damages to receivership to dissolution of the corporation. To interpret ORS 60.952, we apply our usual methodology to discern the intent of the legislature by examining the text, context, and legislative history of the statute. *See [State v. Gaines](#)*, 346 Or 160, 206 P3d 1042 (2009).

We begin by examining the text and context of the terms "filing of a proceeding" and "proceeding under subsection (1)," to understand their meaning and to determine whether either term conclusively excludes Giller's third-party complaint, such that Graydog's election must fail. After finding the text of both terms to be imprecise, and case law to be relatively unhelpful, we turn to the legislative history of ORS 60.952 and related academic commentary to gain an understanding of the legislature's intent in enacting the statute. Based on that understanding, we conclude that in the circumstances here, where Giller's third-party complaint did not contain the claims for relief or seek the equitable remedies identified in ORS 60.952(1) and (2), and where the procedural context of the third-party complaint demonstrated that it was a defensive response to an attempted squeeze-out by the majority shareholder, the legislature did not intend to allow an election under ORS 60.952(6).

A.   *Text and Context*

1.   *"Filing of a proceeding"*

An initial textual dispute is whether the term "filing of a proceeding" in ORS 60.952(6) can mean, among other things, the filing of a third-party complaint, or whether it is limited to the initial filing of a complaint by a shareholder in a corporate dispute involving a closely held corporation. Giller asserts that his third-party complaint against Westervelt was part of the same action as the declaratory

judgment action that Graydog filed against him and, thus, that he did not "file" a "proceeding" for purposes of that provision. Graydog argues that a third-party complaint, bringing new claims against a new party, is such a "proceeding." This is a threshold issue, because if Giller is correct that filing a third-party complaint never can mean "filing a proceeding" for purposes of ORS 60.952(6), then Giller prevails. We begin our interpretive exercise by looking to the legislature's definition of the word "proceeding" for purposes of ORS chapter 60: "a civil, criminal, administrative or investigatory action." ORS 60.001(24). That statutory definition, however, is of limited value, because the ordinary legal meaning of the word "action" is a "civil or criminal judicial proceeding," *Black's Law Dictionary* 35 (10th ed 2009), rendering the definition, as least as applicable here, circular and generally unhelpful.

Dictionary meanings are more helpful in seeking to understand other words in the key phrase "filing of a proceeding," and the operative words in that phrase have several common meanings in the law. The verb "file" can mean "[t]o commence a lawsuit," as in "the seller threatened to file against the buyer." *Black's* at 745. That definition pairs with the definition of "proceeding" as "[t]he regular and orderly procession of a lawsuit, including all acts and events between the time of commencement and the entry of judgment." *Id.* at 1398. With those definitions, to "file a proceeding" can mean to commence, or begin, a lawsuit. So understood, the filing of a third-party complaint, as opposed to filing the initial complaint in an action, would *not* constitute the "filing of a proceeding." But a "proceeding" can also mean "[a]n act or a step that is part of a larger action," *id.* at 1398, and "file" can also mean the "deliver[y]" of a "legal document" to a court, *id.* at 745. Under those definitions, the "filing of a proceeding" could mean commencing some discrete part of a single lawsuit. Particularly where, as here, the third-party complaint asserts claims distinct from those in the initial complaint and could have been filed as a separate action apart from and in the absence of the initial complaint, it would unduly elevate form over substance to conclude that filing a third-party complaint never can be "filing of a proceeding" for purposes of ORS 60.952(6).

It follows that the phrase "filing of a proceeding" can be read either more broadly, to encompass the filing of a third-party complaint in an existing civil action, or more narrowly, to mean only the filing of an initial complaint or other action. To further interpret ORS 60.952, we look beyond the text to see if the legislature intended a particular meaning when it used the phrase in that statute.

The parties cite several decisions of this court as context for the word "action," which is part of the definition of "proceeding" in ORS 60.001(24). *See OR-OSHA v. CBI Services, Inc.*, 356 Or 577, 593, 341 P3d 701 (2014) (noting that case law existing at the time of a statute's enactment is part of the statutory context). Only one recent case actually interpreted the word "action" as part of its holding. In *Montara Owners Assn. v. La Noue Development, LLC*, 357 Or 333, 353 P3d 563 (2015), we held that "first-party claims *** and third-party claims *** are part of the same 'action.'" 357 Or at 356.[4] There, a homeowners association brought a construction-defect action against a developer, who in turn filed a third-party complaint against a subcontractor. The first-party plaintiff and first-party defendant settled, leaving only the third-party claim between the developer and subcontractor to go to trial. *Id.* at 337. The developer sought to present to the jury a claim for attorney fees as incidental damages, but the subcontractor argued that ORCP 68, "govern[ing] the pleading, proof, and award of attorney fees in all cases," prescribed a different procedure for awarding attorney fees. *Id.* at 355 (emphasis omitted; quoting ORCP 68 C(1)). ORCP 68 contains an exception to that procedure, however, for fees that arose "prior to the action." ORCP 68 C(1)(a). To resolve that dispute, this court had to determine if the first-party action, which settled before trial, was part of the same "action" as the third-party claims going to trial. We examined ORCP 22 C(1), which, "in discussing third-party practice, refers to both first- and third-party claims as part of 'the action,'" and concluded that first-party claims

---

[4] Case law decided after the enactment of a statute may also be "persuasive" in interpreting the statute. *OR-OSHA*, 356 Or at 593. Here, *Montara Owners Assn.* was decided while this case was under advisement at the Court of Appeals—well after the enactment of ORS 60.952—but it is nonetheless potentially relevant to our analysis.

and third-party claims are part of the same action. *Montara Owners Assn.*, 357 Or at 356-57. Giller analogizes this case to *Montara Owners Assn.* and argues that his third-party complaint is part of the same "action" as the first-party complaint.

We think that *Montara Owners Assn.*'s relevance is limited, however, because it interprets the word "action" as it appears in the context of ORCP 68, not the Oregon Business Corporation Act. Giller and Graydog also discuss a number of other cases, some of which the Court of Appeals found significant, that purport to bear on the meaning of the word "action." But the references to "action" are generally made in passing, *see, e.g.*, *O'Connell, Goyak & Ball v. Silbernagel*, 297 Or 207, 210, 681 P2d 1159 (1984), or the cases predate our current civil rules and are not dispositive, *see, e.g.*, *Ryals et ux. v. Smith et al.*, 202 Or 470, 275 P2d 853 (1954). To the extent they are helpful at all, they support our initial assessment that "file" and "proceeding" do not have unitary definitions that unambiguously resolve this case. Instead, those words have various meanings, depending on context. Looking simply at the differing definitions of the words and our cases interpreting them in other contexts, Giller has a plausible argument that his third-party complaint was not the "filing" of a "proceeding" under ORS 60.952(1) or (6) that would trigger the buyout right, and Graydog has a plausible argument that a third-party complaint could constitute such a proceeding.

2. *A proceeding "under subsection (1)"*

The remedies in ORS 60.952(2) and the election to purchase shares under ORS 60.952(6) are available only in proceedings involving corporate control and not other issues, like a shareholder's slip and fall at the corporate office—that is, proceedings "under subsection (1)," which we quoted above. "Under" means "in accordance with," *Webster's Third New Int'l Dictionary* 2487 (unabridged ed 2002), and in this context has little substantive meaning independent of the reference to "subsection (1)." Subsection (1) itself, however, is rich with meaning: it defines a closely held corporation; identifies particular circumstances in which a shareholder may bring an action under the statute—including

management or shareholder deadlock, corporate waste, or illegal, fraudulent, or oppressive conduct by those in control of the corporation; and empowers the court to order certain remedies.

Several of the circumstances identified in subsection (1) are straightforward, such as whether "shareholders are deadlocked in voting power and have failed, for a period that includes at least two consecutive annual meeting dates, to elect successors to directors whose terms have expired." ORS 60.952(1)(c). In this case, however, Graydog argues that Giller's third-party complaint triggers the election provision because Giller seeks to "establish[]" that "[t]he directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive or fraudulent." ORS 60.952(1)(b). Graydog urges us to look to the *facts* Giller alleges about Westervelt's conduct—facts that, Graydog asserts, establish "prototypical oppressive conduct"—as revealing his claim to be actually a claim for oppression.[5] Giller responds by emphasizing that he intentionally limited the claims he asserted and the remedies he sought in his third-party complaint, such that it contains straightforward breach of contract and declaratory judgment claims that do not implicate traditional notions of majority shareholder "oppression."

We turn briefly to consider the distinguishing characteristics of a claim for oppression. In *Baker v. Commercial Body Builders*, 264 Or 614, 507 P2d 387 (1973), this court repeated a widely quoted English definition of oppressive conduct as

"burdensome, harsh and wrongful conduct; a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members; or a visual departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely."

*Id.* at 628-29. Put another way, conduct that violates the majority shareholders' fiduciary duty to a minority shareholder

---

[5] Graydog does not argue that Giller has made a claim for "illegal" or "fraudulent" conduct, and we do not address the meaning of those terms in ORS 60.952(1)(b).

in a close corporation is "likely to be oppressive." *Naito v. Naito*, 178 Or App 1, 20, 35 P3d 1068 (2001); *accord Baker*, 264 Or at 629 ("'[O]ppressive' conduct by those in control of a 'close' corporation as its majority stockholders is closely related to * * * the fiduciary duty of a good faith and fair dealing owed by them to its minority stockholders."). "The majority shareholder of a close corporation owes the minority fiduciary duties of loyalty, good faith, fair dealing and full disclosure." *Chiles v. Robertson*, 94 Or App 604, 619, 767 P2d 903, *modified on recons*, 96 Or App 658, 774 P2d 500, *rev den*, 308 Or 592 (1989). Whether or not a party's specific conduct is oppressive, however, is a highly factual matter. *See Baker*, 264 Or at 628 ("[G]eneral definitions of 'oppressive' conduct are of little value for application in a specific case."). The success of a claim depends on the facts and circumstances of the majority's conduct; for example, the presence of a legitimate business reason for a decision may affect whether certain conduct is oppressive. *See, e.g.*, *Cooke v. Fresh Express Foods Corp.*, 169 Or App 101, 113, 7 P3d 717 (2000) (considering "the business reasons that defendants present for their actions"). As discussed in *Baker* and elsewhere, the concept of oppressive conduct and fiduciary duty eludes precise articulation. *Baker*, 264 Or at 628; *see also Chiles*, 94 Or App at 619 ("[T]he heart of a corporate fiduciary's duty is an attitude, not a rule.").

Another recurring issue in the litigation of oppression claims is the difficulty of fashioning a remedy that responds to the majority shareholder's misconduct but does not harm corporate operations or shareholder value. Reflecting the varied "facts of the case and the nature of the problem involved" in claims of oppression, *Baker*, 264 Or at 631-32, Oregon cases have long required courts to carefully tailor remedies for oppression claims. *See, e.g.*, *Browning v. C & C Plywood Corp.*, 248 Or 574, 582, 434 P2d 339 (1968) (denying plaintiff's request for dissolution of corporation as "untenable" and remanding case to trial court to "determine what the precise relief should be"). Depending upon the circumstances, "dissolution [or] * * * other appropriate equitable relief" may be proper. *Baker*, 264 Or at 631. The court in *Baker* compiled a list of alternative equitable remedies for oppression, *id.* at 631-33, which, as we will discuss below,

formed the basis for the additional remedies enacted when ORS 60.952 was amended in 2001. Both our earlier cases and legal commentators establish that whether conduct by controlling shareholders constitutes oppression will depend on the relationship between the parties, the financial and business context of the conduct, and the parties' history of dealings, among other things, and that, when oppression is demonstrated, a court may impose a variety of equitable remedies, up to and including dissolution of the corporation. *See* Robert B. Thompson, 2 *Close Corporations and LLCs: Law and Practice* § 9:35, 9-245 (3d ed 2017) (discussing variety of relief available in oppression cases).

We return to the question whether Giller's third-party complaint was actually a claim for oppression. The task of determining whether a party's labeling of a claim actually reflects the true nature of the claim arises in several contexts and lacks a definitive answer. As noted, the Court of Appeals analyzed Giller's claims using the standard from *Htaike*. It acknowledged, however, that the purpose in *Htaike*—distinguishing contract claims from tort claims to properly apply the statute of limitations—differs from the proper application of ORS 60.952(6) and that tests serving those functions "will [not] necessarily be identical." *Graydog Internet, Inc.*, 279 Or App at 732 n 7. *Htaike,* in turn, was based on *Securities-Intermountain v. Sunset Fuel*, 289 Or 243, 611 P2d 1158 (1980), which also concerned the application of the statute of limitations to contract and tort claims. In that case, this court analyzed the history of statutes of limitation in Oregon, going back to the Deady Code, and reviewed cases applying those statutes. *Id.* at 253. The court concluded that the body of law that had developed to determine the "real" character of an action in that context was "the product of case-by-case development more than of any single coherent theory." *Id.* at 252.

Although *Securities-Intermountain* did not establish a clear, easily applied test for determining the "true" nature of a claim, it does provide support for Giller's position that courts generally should accept a party's characterization of the party's own claims. *Securities-Intermountain* discussed with approval earlier decisions by this court that

> "took plaintiff's pleading on its own terms * * * [and] did not purport to look beyond a well-pleaded complaint so as to impose upon plaintiff a contrary characterization of his cause of action that would defeat it."

289 Or at 254. And that statement is an application of the longstanding rule that "the party who brings a suit is master to decide what law he will rely upon." *The Fair v. Kohler Die & Specialty Co.,* 228 US 22, 25, 33 S Ct 410, 57 L Ed 716 (1913) (Holmes, J.); *see also Caterpillar Inc. v. Williams*, 482 US 386, 392, 107 S Ct 2425, 96 L Ed 2d 318 (1987) (discussing federal "well-pleaded complaint rule," which "provides that federal jurisdiction exists only when a federal question is presented on the face of plaintiff's properly pleaded complaint," and which "makes the plaintiff master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law"); *Redwood Theaters, Inc. v. Festival Enterprises, Inc.*, 908 F2d 477, 479-80 (9th Cir 1990) (applying well-pleaded complaint rule to remand antitrust complaint to state court, despite potential nationwide effect of litigation, and noting "plaintiffs' prerogatives to choose the forum *and legal principles* governing their complaints" (emphasis added)).

Giller did not expressly invoke ORS 60.952(1)(b), assert a breach of fiduciary duty, or make any claim of "oppression" as a ground for his third-party complaint against Westervelt. Indeed, he disclaimed any reliance on that statute or any theory of oppression, and, under the cases just discussed, his choice of legal theories is entitled to some degree of deference. Nevertheless, given the absence of a "single coherent theory" for determining the "true" nature of a plaintiff's claims, as well as the nebulous nature of oppression claims generally, we turn to the context and legislative history of ORS 60.952(1)(b) to see whether they shed any light on the kind of claims the legislature intended to be included within the term "oppressive" conduct under ORS 60.952(1)(b).

B.  *Context and Legislative History of ORS 60.952*

Helpfully, the legislative history of ORS 60.952 contains extended discussions of the legislature's intentions in enacting that statute. Senate Bill (SB) 116 (2001), codified

as ORS 60.952, sought to improve the legal framework regulating closely held corporations by amending the Oregon Business Corporation Act. Robert C. Art, *Shareholder Rights and Remedies in Close Corporations: Oppression, Fiduciary Duties, and Reasonable Expectations*, 28 J Corp L 371, 407 (2003).[6] Therefore, in addition to examining the legislative history materials, we refer to treatises and commentary describing the problems that the statute was intended to ameliorate.

   1.   *The minority shareholder in the close corporation*

         ORS 60.952 concerns court proceedings by shareholders in closely held corporations—corporations that "do[ ] not have shares that are listed on a national securities exchange or that are regularly traded." ORS 60.952(1). A distinguishing characteristic of closely held corporations is the vulnerability of their minority shareholders to oppression and mistreatment by the shareholder majority, such as by restricting the minority shareholder's participation in corporate governance, limiting access to corporate assets, managing the corporation for the benefit of the majority shareholder, or seeking to eliminate the minority's ownership interest, usually without fair payment. Thompson, 2 *Close Corporations and LLCs* § 9:2 at 9-8; *see also* Audio Recording, Senate Committee on Business, Labor and Economic Development, SB 116, Jan 15, 2001, at 13:10 (statement of Robert Art); http://sos.oregon.gov/archives/Pages/records/legislative-minutes-2001.aspx (accessed Aug 16, 2017) [hereinafter Statement of Robert Art] (explaining that majority oppression can prevent the minority from "getting any income from the corporation or having any voice and control"). Because shareholders in close corporations, by definition, lack a ready market for their shares, dissatisfied minority shareholders may be unable to sell their shares "without suffering serious financial loss." Thompson, 2 *Close Corporations and LLCs* § 9:2 at 9-5. And, often, minority shareholders in closely held corporations are actively engaged

---

   [6] Professor Robert Art of Willamette University College of Law chaired the task force that drafted ORS 60.952. Our understanding of the legislative history of that statute draws on his article describing SB 116 and his testimony in support of it during the 2001 legislative session.

in the business as directors, officers, or employees. That involvement in the firm can make them more vulnerable to abuse by the shareholder majority; it also means that shareholder disputes can result in "serious harm" to the enterprise. *Id.* § 9:2 at 9-4, 9-6.

To protect minority shareholders, many states have developed legislative and judicial remedies to respond to shareholder oppression and other unfair treatment of the noncontrolling shareholders. *Id.* § 9:2 at 9-8 to 9-10. Historically, the only codified remedy for oppression or corporate deadlock was the dissolution of the corporation and distribution of its assets to the owners. *See, e.g.*, ORS 60.661 (1987), *amended by* Or Laws 2001, ch 215, § 58 (setting out only judicial dissolution as the statutory remedy for oppression). But courts and commentators have criticized dissolution as a "severe and harsh remedy." Thompson, 2 *Close Corporations and LLCs* § 9:43 at 9-295; *see also* Statement of Robert Art at 15:06 (describing judicial dissolution as "probably the worst solution for everyone"). Moreover, in the absence of alternative statutory remedies, courts exercised their equitable powers to fashion specific remedies to address the corporate management and shareholder issues in particular cases. *See Baker*, 264 Or at 631-33 (identifying remedies "alternative to dissolution"); *see also* Thompson, 2 *Close Corporations and LLCs* § 9:35 at 9-245 (noting "judicial willingness to provide alternative relief even if a statute does not explicitly provide for alternative relief").

Today, state statutes provide alternative remedies to dissolution. Consistent with that trend, a "principal change" contained in SB 116 was to specify additional remedies, beyond dissolution, that would be available to shareholders who could establish liability under ORS 60.952(1). Art, 28 J Corp L at 409, 409 n 254 (noting that the additional remedies were consistent with the list of remedies in *Baker*, 264 Or at 631-33). The new law instructed judges to order dissolution of a corporation only when no other remedy "is sufficient to resolve the matters in dispute," ORS 60.952 (2)(m), and codified remedies previously available under the court's equitable powers to order changes in corporate management, ORS 60.952(2)(c), (d), (f), (g), the conduct of

the corporation's business, ORS 60.952(2)(a), the documents governing the corporation, ORS 60.952(2)(b), or the distribution of the corporation's assets, ORS 60.952(2)(i). The enumerated remedies also include a buyout—a court-ordered sale for fair value of all shares belonging to the plaintiff shareholder. *See* ORS 60.952(2)(k) (providing for court-ordered sale of shares); *see also* Statement of Robert Art at 14:30 (describing a court-ordered sale as preferable to dissolution because a buyout "allows the business to continue, [and] it gives fair value to the departing shareholder with fair value being determined by the court"). A procedurally different buyout—not one ordered by the court, but available at the option of the corporation or another shareholder—is the election provision set out in ORS 60.952(6) at issue here. We return to that provision now.

### 2. *The election to purchase*

Under Oregon law, as well as statutes in other states regarding litigation involving closely held corporations, the corporation or shareholders may to elect to purchase, for "fair value," the shares of a minority shareholder when the minority shareholder seeks a judicial remedy for oppression. Section 14.34 of the 1991 Model Business Corporations Act (MBCA) illustrates that type of provision and provided the model for Oregon's statute.[7] Art, 28 J Corp L at 414. Under the MBCA, an election is available in a "proceeding under section 14.30(2) *to dissolve* [a close corporation]." MBCA § 14.34 (emphasis added). In contrast, the Oregon statute contains no such requirement that a party seek dissolution to trigger an election. ORS 60.952(6) (allowing an election in a "proceeding under subsection (1)"). Rather, the statutory term "proceeding under subsection (1)" "refer[s] to a proceeding \*\*\* [that] may seek any of a long list of remedies, of which dissolution is only one." Art, 28 J Corp L at 414 n 294.

---

[7] MBCA § 14.34(a) provides, in part:

"In a proceeding under section 14.30(2) to dissolve a [close corporation] \*\*\*, the corporation may elect or, if it fails to elect, one or more shareholders may elect to purchase all shares owned by the petitioning shareholder at the fair value of the shares. An election pursuant to this section shall be irrevocable unless the court determines that it is equitable to set aside or modify the election."

The Oregon and MBCA election statutes share the purposes of providing an incentive for shareholders to resolve their disputes without resorting to a "proceeding under subsection (1)" and providing a shortcut to a remedy when litigation does arise. Reducing litigation between shareholders in close corporations is desirable policy because it protects the firm, its employees, and other stakeholders from the consequences of extended litigation. *See* MBCA § 14.34 comment ("[A] resort to litigation may result in an irreparable breach of personal relationships among the shareholders of a closely-held firm, making it impossible for them to continue in business to their mutual advantage."). Steve Naito, testifying in support of SB 116, spoke about the costs, monetary and otherwise, associated with litigating disputes between shareholders in a close corporation:

> "[T]hey are extremely expensive cases to litigate. They take a substantial amount of time and money. And again because it involves a lot of interpersonal issues it becomes just like a personal divorce—a marital divorce. It raises a lot of issues that no one ever wants to raise, especially in a court of law and it effectively—or in many cases it effectively—destroys the relationship of the parties going forward."

Audio Recording, Senate Committee on Business, Labor and Economic Development, SB 116, Jan 15, 2001, at 25:41 (statement of Steve Naito); http://sos.oregon.gov/archives/Pages/records/legislative-minutes-2001.aspx (accessed Aug 16, 2017). The election provision in ORS 60.952(6) provides a means of lessening the costs, including those related to interpersonal disputes, associated with a litigated resolution to a shareholder dispute.

The election provision reduces the costs associated with litigation in two ways. First, it discourages shareholders who wish to retain an interest in the firm from taking oppression claims to court, because only shareholders willing to be bought out will file a proceeding "under" ORS 60.952(1). *See* Art, 28 J Corp L at 416 ("For the plaintiff shareholder, filing a complaint, in effect, grants a 'call' to the corporation and the other shareholders—an obligation to sell, even if the plaintiff might prefer a different outcome."). Second, when such an oppression claim is brought,

it allows a court to order the sale of all of a shareholder's shares *before* trial, even if there are unresolved issues of fact that would prevent summary judgment.

However, a statutory election to purchase, such as that in ORS 60.952(6), and other types of buyouts, have as a "principal disadvantage" that a majority shareholder may use them to "squeeze out a minority shareholder who wants to remain in the business." Thompson, 2 *Close Corporations and LLCs* § 9:6 at 9-29. Providing a minority shareholder in a close corporation with "fair value" for its shares may not adequately compensate shareholders faced with a squeeze-out, because shareholders in close corporations are more than "mere lenders of capital with only an economic interest in the corporation." Robert B. Thompson, *Squeeze-Out Mergers and the "New" Appraisal Remedy*, 62 Wash U L Rev 415, 433 (1984). Rather, shareholders in a close corporation who are squeezed out "lose more than the proportionate value of their shares" because, in addition to being an investment, the corporation may be a place of employment and a primary source of income and retirement benefits. *Id.*; *see also Naito*, 178 Or App 1 (illustrating ownership in a close corporation as more than a financial investment). Moreover, valuation of shares in a closely held corporation may be "very difficult." *Id.* Nevertheless, buyouts can be an effective means of resolving shareholder disputes and may be provided for in a shareholder agreement, a firm's articles of incorporation or bylaws, state statutes, or as part of an *ad hoc* negotiated settlement. *See* Thompson, 2 *Close Corporations and LLCs* § 9:6 at 9-30 (discussing buyout provision in the corporate charter); *id.* § 9:37 at 9-256 (discussing judicially ordered buyouts provided by statute). Unless those circumstances are present, the minority shareholder in a close corporation may continue to be an owner and decline offers to purchase its shares.

*Cubalevic v. Superior Court of Los Angeles County*, 240 Cal App 2d 557, 49 Cal Rptr 698 (1966), is illustrative. There, the court emphasized the right of a minority shareholder to maintain ownership of its shares and construed the California election buyout statute to be a narrow exception to that right. The plaintiff, a 50 percent shareholder, filed a complaint alleging misconduct against corporate

officers and other shareholders. One of his claims sought to dissolve the corporation under a state statute. *Id.* at 558, 49 Cal Rptr at 698. The defendants filed an election to purchase the plaintiff's shares as permitted under the statute when a shareholder filed a claim seeking dissolution. *Id.* at 560, 49 Cal Rptr at 699. In response, the plaintiff dismissed his claim to dissolve the corporation. *Id.* The trial court nonetheless allowed the defendants to proceed with their purchase of the plaintiff's shares. The appellate court reversed, holding that the election to purchase could not proceed after the claim for dissolution has been dismissed. It explained that, outside of the election procedure permitted by statute in certain narrow circumstances, controlling shareholders in a corporation have no "independent right *** to compel the sale to them of the shares of stock of another." *Id.* at 562, 49 Cal Rptr at 701. *Cubalevic* thus illustrates the court's protection of the minority shareholder's right to refuse to sell its shares in the context of the legislature's creation of an exception to that right.

The legislative history of ORS 60.952(6) shows that the legislature intended to discourage litigation between shareholders, with its potential for acrimony and harm to the firm and others, by providing an incentive for shareholders to resolve their disputes in some way other than a "proceeding under subsection (1)." But it also recognized that the solution is imperfect because a shareholder's ownership stake may represent more than a solely financial investment, and a shareholder subject to a court-ordered sale of its shares for "fair value" may be incompletely compensated for its loss.

C.  *Discussion*

With that understanding of the statute, its context, and the legislative history, we return to the question here: What kind of "proceeding" triggers the availability of an election to purchase under ORS 60.952(6)? Put another way, what allegations, claims, and remedies in a third-party complaint would make it appropriate to characterize that complaint as "a proceeding under subsection (1)"? We answer that question by examining, first, the contents of Giller's third-party complaint and comparing it with the grounds

for liability and the remedies that the legislature identified in ORS 60.952. We then consider whether allowing Graydog to elect to buy Giller's shares based on Giller's filing of the third-party complaint is consistent with the legislature's intentions in adopting ORS 60.952, and the election provision in ORS 60.952(6) in particular.

As noted, Giller's third-party complaint does not explicitly claim oppressive conduct by Graydog or Westervelt, nor does it purport to state a claim for relief on any of the grounds identified in ORS 60.952(1)(a)-(d). Graydog argues, however, that Giller's factual allegations support a claim for oppression, identifying specific allegations that, it asserts, would state such a claim against Westervelt. Graydog is correct that some of Giller's allegations *could* support a claim for breach of fiduciary duty or oppression and that the parties' dispute involves shareholder disagreements and allegations of improper conduct. But Giller limited his claims for relief to breach of contract, breach of the contractual duty of good faith and fair dealing, and a declaratory judgment.

Graydog does not explain how the presence of allegations that could support a claim of oppression can change the claims Giller did assert into claims that he, in fact, intentionally did not assert. *See Redwood Theaters,* 908 F2d at 470 (Plaintiffs have the "prerogative[] to choose * * * the legal principles governing their complaints."). The observation that certain factual allegations might *also* establish claims for breach of fiduciary duty or other oppressive conduct does not necessarily mean that the "true substance" of the third-party complaint is a claim for "oppression" or that the third-party complaint is a "proceeding under subsection (1)," a provision that does not mention breach of contract or declaratory judgment claims.

Similarly, the *remedies* Giller seeks do not suggest that his third-party complaint is the kind of claim for oppression "under subsection (1)" with which the legislature was concerned. The legislative history discussed above shows that in ORS 60.952(2), the legislature sought to codify remedies for oppression that were previously available through the court's equitable powers. Here, Giller seeks money damages on his contract claims, and although damages are one

of the many remedies identified in ORS 60.952(2), they are, of course, the paradigmatic remedy for contract claims and are unlike the equitable remedies traditionally associated with claims for oppression. Giller's contract claim does not seek changes in management, control, or corporate operations; dissolution; the issuance of distributions; or a forced buyout. And although Giller seeks a declaration that the shareholder agreement is void and unenforceable, he does not otherwise ask the court to intervene in Graydog's operations. The remedies Giller seeks suggest that his claims are not the kind of shareholder litigation with which the legislature was concerned when it identified the panoply of remedies available for shareholder oppression. *See Securities-Intermountain*, 289 Or at 260 (examining remedies sought as one means to determine true nature of complaint: "the scope of damages demanded may characterize a complaint as founded in tort rather than in contract").

As to his claim regarding the shareholder agreement, Giller, as noted, sought relief under the Uniform Declaratory Judgments Act, not under ORS 60.952(2). Moreover, although ORS 60.952(2)(b) authorizes a court to invalidate articles of incorporation and bylaws, it does not mention shareholder agreements. It may be that, in some circumstances, a shareholder could seek to void a shareholder agreement as a remedy for an oppression claim, but that is not the grounds upon which Giller relied in his third-party complaint. Westervelt, acting through Graydog, began this litigation by seeking to squeeze-out Giller by virtue of the shareholder agreement's provision that only employees may be shareholders. In that procedural setting, Giller's declaratory judgment claim is more properly seen as a minority shareholder's defense against a squeeze-out attempt, which is not a situation in which the legislature intended the election to be available.

In sum, the third-party complaint contains claims for breach of contract and a declaratory judgment, and it does not cite ORS 60.952 or expressly allege any of the grounds for liability found in ORS 60.952(1). Likewise, except for the money damages, the third-party complaint seeks remedies that are distinguishable from the various equitable remedies allowed under ORS 60.952(2). Based on

those facts, Giller's third-party complaint does not appear to be a proceeding "under" ORS 60.952(1).

That appearance is bolstered by the procedural posture of Giller's third-party complaint. It is evident from the legislative history that a purpose of the legislature in enacting ORS 60.952(6) was to reduce litigation over the control and management of closely held corporations—that is, "proceeding[s] under subsection (1)"—by discouraging parties from initiating such litigation, and, in certain circumstances when such litigation has been initiated, allowing the corporation or a shareholder to elect to buy the shares of the "shareholder who filed the proceeding."

In the context of this case, the legislature's purpose of discouraging litigation by providing an incentive for prelitigation resolution of disputes would not be served by allowing Graydog to file an election based on Giller's third-party complaint. A third-party complaint may be filed only "[a]fter commencement of the action." ORCP 22 C(1). Here, the action was commenced by Graydog. Allowing Graydog to file an election based on Giller's third-party complaint would benefit Graydog and Westervelt and thus provide an incentive, rather than a disincentive, for future actors in the position of Graydog and Westervelt to begin litigation against minority shareholders. Giller's third-party complaint against Westervelt did not join a person who was previously uninterested, unaligned, or uninvolved in the litigation. Rather, the personal animosity between Giller and Westervelt was already apparent when Graydog filed the declaratory judgment action. Giller's third-party complaint was essentially a response in kind to an existing proceeding, initiated by Graydog (at the behest of Westervelt), rather than the initiation of shareholder litigation in the first place.

State law governing close corporations has as one purpose the protection of minority shareholders from oppression and mistreatment by the majority shareholder. That includes the protection of the right of a shareholder to decline to sell its shares to the corporation or another shareholder in the absence of some legal obligation to do so. *See Cubalevic*, 240 Cal App 2d at 562, 49 Cal Rptr at 701 ("There is no independent right on the part of one or more stockholders in a

corporation to compel the sale to them of the shares of stock of another."); *see also* Thompson, 62 Wash U L Rev at 433 ("Shareholders who are squeezed out of [close corporations] lose more than the proportionate value of their shares."). The election provision in ORS 60.952(6) is an exception to that right, because it imposes an obligation on a shareholder to sell its shares in certain circumstances.

Giller's third-party complaint was filed in an existing dispute, it joined a party who was already intimately involved in the litigation, and it contained contractual claims and a claim under the Uniform Declaratory Judgments Act. The third-party complaint sought a declaratory judgment as a defense against a squeeze-out attempt of which the initial complaint was a part, and the third-party complaint's contractual claims sought money damages rather than the equitable remedies typical of oppression claims. For those reasons, we conclude that Giller's third-party complaint against Westervelt is not a "proceeding under subsection (1)," and, therefore, it did not trigger the election provision of ORS 60.952(6).

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed, and the case is remanded to the circuit court for further proceedings.